STATE OF VERMONT
SUPERIOR COURT - ENVIRONMENTAL DIVISION

|  |  |  |
|---|---|---|
| | { | |
| In re Whiteyville Properties, LLC | { | Docket No. 179-12-11 Vtec |
| Conditional Use Application | { | (Appeal from Burlington DRB denial of |
| | { | Application No. 12-0470CA/CU) |
| | { | |

## Decision on the Merits

Whiteyville Properties, LLC ("Applicant") seeks conditional use approval to increase the maximum occupancy from four to six unrelated tenants for one of the four existing apartments at its property at 22–26 Summit Avenue in the City of Burlington ("City"). Applicant also seeks approval to increase the authorized parking on its property to a total of thirteen parking spaces. When the City of Burlington Development Review Board ("DRB") denied Applicant's requests, Applicant filed a timely appeal with this Court.

Pursuant to the Court's initial Scheduling Order of February 14, 2012, the parties sought to resolve the pending legal disputes through negotiation, including with the assistance of a mediator. When those efforts failed, Applicant requested that the Court enter summary judgment in its favor; the Court denied Applicant's motion for summary judgment by Entry Order. In re Whiteyville Properties, LLC, No. 179-12-11 Vtec, slip op. at 4 (Vt. Super. Ct. Envtl. Div. Dec. 13, 2012) (Durkin, J.). The parties thereafter prepared for trial, which was conducted on August 6, 2013. The Court granted the parties' request for permission to file proposed Findings of Fact and Conclusions of Law; those filings were submitted and this matter came under advisement on September 17, 2013. Other writing obligations caused a delay in the Court's completion of its research and writing of this Decision, and the Court offers its apology for this delay.

Pursuant to the parties' joint suggestion, the Court visited the site alone, without the parties or their attorneys. This site visit provided helpful context for the testimony and other evidence that was admitted at trial. The Court only relied upon the site visit for context and did not rely upon any observations made during the site visit as evidence.

Present at trial were Eric Hanley and Michael Johnson, Esq., a Vermont-licensed attorney, both of whom are the only members of Whiteyville Properties, LLC (a Vermont limited liability company), as well as Applicant's attorney, Edward D. Fitzpatrick, Esq. Also

present at trial was the City's attorney, Kimberlee J. Sturtevant, Esq., who was accompanied by Scott Gufston, the City of Burlington Senior Planner.

Based upon the evidence admitted at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact, Conclusions of Law, and the Judgment Order that accompanies this Merits Decision:

**Findings of Fact**

1. Applicant's property is located at 22–26 Summit Street and is improved with a main house, a former carriage house, and a shed, all of which are depicted on Applicant's proposed site plan, admitted at trial as Exhibit 33. A copy of Exhibit 33 is attached to this Decision for the readers' reference. We caution, however, that this photocopy may not represent an accurate scale of the site.

2. The main house on Applicant's property has a street address designation of 26 Summit Street; the former carriage house has a designation of 22 Summit Street. The property consists of one lot, even though the buildings have been assigned separate street addresses.

3. The property was previously owned and occupied by Mr. Hanley's grandparents. Mr. Hanley's grandparents sometimes rented 3 bedrooms on the third floor of the main house to up to 10 tenants, most of whom were students attending Champlain College, which has a main campus several blocks west of the property.

4. Mr. Hanley's grandparents always occupied a portion of the main house as their residence while they were renting the third-floor bedrooms. Their ownership and rental of rooms continued for several decades. Trial testimony did not evidence an occasion during the grandparents' room rental when there was a substantial noise disturbance that caused adjoining residents to complain.

5. Mr. Hanley, his wife, and his children have previously lived together in the carriage house on his grandparents' property. Mr. Hanley is very familiar with the property, the neighborhood, and the rental of rooms by his grandparents.

6. The property is located in the Low Density Residential Zoning District ("RL District"), as identified in the City of Burlington Comprehensive Development Ordinance ("CDO"). See CDO § 4.4.5(a)(1). The RL District is bordered on the north, east, and west by the Institutional Zoning District ("I District"). Portions of the campuses for the University of Vermont ("UVM") and Champlain College are located within or adjacent to the RL District.

2

7. The portion of the RL District hosting Applicant's property is bordered to the north by Main Street, to the west by Summit Street, and to the east by South Prospect Street. The RL District continues to the south, across Maple Street, and beyond the neighborhood that includes Applicant's property.

8. The properties abutting or near Applicant's property are mostly developed with residential dwellings. The dwellings along Summit Street to the north and south of Applicant's property were at the time of trial owner-occupied, single family dwellings, as was the property at 195 South Prospect Street, which is at the rear of Applicant's property and abuts the southeast corner of Applicant's property.

9. Some of the remaining properties in Applicant's neighborhood contain one or more dwelling units, some of which are occupied by student-tenants enrolled at UVM or Champlain College. Many, though not all, of these rental properties are also occupied by the property owners.

10. The neighborhood surrounding Applicant's property is accurately depicted on an aerial photo that was admitted at trial as Exhibit 31. Exhibit 31 includes text identifying some of the buildings and streets in the surrounding area.

11. As depicted on Exhibit 31 and through the credible trial testimony, the area surrounding Applicant's property is almost entirely developed, although there are some open and green areas. Nearly all of the nearby properties are used for residential purposes.

12. This neighborhood also includes a college dormitory and a fraternity, located at 56 Summit Street and 215 South Prospect Street, respectively. The dorm and fraternity have each been permitted to serve as living quarters with up to 14 dwelling units.[1]

13. Another property near Applicant's property, located at the corner of South Prospect and Main Streets (identified as 153 South Prospect Street) hosts a UVM educational building; this building does not serve as a residence.

14. The surrounding area has the qualities of a quiet residential neighborhood, even though a college and a university are located nearby. Our conclusion is based upon and supported by the lister's cards Applicant put into evidence, describing the twenty-nine properties in the Neighborhood around Applicant's property. See Exhibits 1 through 29, inclusive.

---

[1] Trial evidence did not make clear whether one or more students occupied each of the "units" in the dormitory and fraternity. See Exhibit 41. It was therefore unclear whether these structures served as a residence for 14 or more students.

3

15. The area surrounding Applicant's property is not, as suggested by Applicant's witnesses, a densely-populated area.

16. The property was acquired in Applicant's name in July 2010. Applicant's agents completed certain improvements to the property's buildings so that the main and carriage houses could each host two dwelling units with multiple bedrooms. While the interior renovations may have been extensive, no significant renovations were made to the exterior of the property. No additional improvements were made or required in connection with Applicant's pending application to host two additional tenants in one of its dwelling units.

17. Once the 2010 improvements were completed, the property consisted of the following:

Main House:
  Unit #1: six bedrooms (1st and 2nd floors)[2]
  Unit #2: four bedrooms (3rd floor)

Carriage House:
  Unit #3: four bedrooms (1st floor)
  Unit #4: three bedrooms (2nd floor)

18. Applicant thereafter rented the property to up to 15 individuals, mostly students.[3]

19. Shortly after Applicant began renting out the improved rental units, one or more neighbors began experiencing noise disturbances that emanated from Applicant's property, including loud conversations late at night that were sometimes laced with profanities. One neighbor credibly testified at trial that debris and other items of personal property sometimes littered Applicant's property and that some tenants or their visitors would sometimes urinate in the narrow area between the rear of the carriage house and the neighbor's rear boundary line.

20. Trial testimony revealed that few disturbances from Applicant's property were reported to City authorities or Applicant's agents. A neighbor credibly testified that she did not want to cause trouble by reporting these disturbances to City officials and could not contact Applicant's

---

[2] While Unit #1 contains six bedrooms, Applicant only rented this unit to four tenants as of the date of trial, due to the CDO restriction on the rental of dwelling units to no more than four unrelated adults. See CDO § 4.4.5(d)(5). A dwelling unit may be rented to more than four unrelated adults, if the landlord receives conditional use approval and satisfies other specified dimensional standards. CDO § 4.4.5(d)(5)(C).

[3] Undisputed testimony revealed that Applicant, through its members, sometimes rented out the two extra bedrooms in Unit #1, thereby increasing the total number of tenants on the property to 17. Applicant's members conceded at trial that they did so without the necessary approval; they have now agreed that conditional use approval and a permit are required before 17 tenants may lawfully be allowed to occupy the property.

4

agents because they had not introduced themselves to her or provided her with their contact information.

21. By its pending application, Applicant seeks authority to increase the total tenants on its property from 15 to 17 by having 2 additional tenants occupy the 2 extra bedrooms that are currently not used in rental Unit #1 (occupying the first and second floors in the main house).

22. The Court surmises that Applicant's two members recognize that the disturbances to their neighbors caused by their current tenants were out of character for this neighborhood, although the members dispute the intensity and frequency of these past disturbances. The Court concludes that the past disturbances emanating from Applicant's property, while not entirely unique to the neighborhood, have not been in keeping with the low-density, often quiet characteristics of this neighborhood. The fact that Applicant's members had not advised the neighbors of who they may contact when disturbances occurred has contributed to the disturbances experienced by the neighbors.

23. With 15 tenants, Applicant's property currently hosts more student-tenants than most of the other properties in the neighborhood. Their application seeks authority to increase the total number of student-tenants to 17.[4]

24. Applicant and its members have not previously seen fit to employ a management plan for the property or its tenants or to employ an on-site manager for the property.

25. In response to the DRB's denial and neighbors' concerns about Applicant's existing rentals and the prospect of increased disturbances that may result from authorizing the increase to 17 tenants, Applicant proposed to establish a written management plan for the property and its tenants. Applicant initially disagreed with the DRB's assessment that a property with as many tenants as Applicant's needed a management plan and an on-site manager. However, at the time of trial, Applicant's members submitted a revised Property Management Plan, a copy of which was admitted as Exhibit 36.

---

[4] We are unsure of whether three other properties in the neighborhood host more tenants than Applicant's property. Applicant provided an itemization of the neighborhood properties' size, use, and number of "units." See Exhibit 41. But it is unclear how many student-tenants occupy the Champlain College dorm at 56 Summit Street, the fraternity at 215 South Prospect Street, or the rental property at 205 South Prospect Street. Applicant's Exhibit 41 lists the number of "units' for each of these properties—14 for the dorm, 14 for the fraternity, and 10 for the rental property—but do not specify whether any of these "units" have more than one tenant.

26. Applicant's revised Property Management Plan includes property and tenant management provisions; identification of Applicant's LLC members; procedures for the selection of a tenant to serve as an on-site manager; and disclosure to City officials and neighbors of the contact information for the property management team (i.e.: the two LLC members) and the on-site manager.

27. The responsibilities of the on-site manager include monitoring compliance with the terms of the management plan and the individual leases and reporting non-compliance and any neighborhood complaints to the two-member management team. The management team is responsible for responding to any neighborhood complaints.

28. Applicant's revised Property Management Plan also includes a reference to the City of Burlington Noise Ordinance ("Ordinance"), specifically Ordinance § 21-13, and an attached copy of Ordinance § 21-13.

29. The Court found it difficult to read the copy of Ordinance § 21-13 that Applicant included as part of its Exhibit 36 and also found several typographical errors or confusing phrases in the proposed Management Plan. The Court has therefore reproduced a copy of Ordinance § 21-13 and attached it to a copy of Exhibit 36, which is attached to this Decision. The Court has also noted where certain typographical corrections need to be made to the Management Plan on the attached copy of Exhibit 36. The Court directs Applicant to make those corrections, incorporate the attached Ordinance § 21-13 into a revised Management Plan, and distribute copies of this revised Property Management Plan to the City, the Court, and all tenants at the property.

30. The property currently has six parking spaces, depicted on Applicant's site plan (Exhibit 33) as parking spaces numbered 2–7. The current parking spaces encompass an area of 2,663 square feet.

31. As noted by the DRB, Applicant has sufficient space behind the main house and to the side of the carriage house to construct and maintain seven additional spaces, numbered 1 and 8–13 on Exhibit 33. These additional spaces will not encroach into the setbacks from the property boundary lines. The proposed new parking spaces will encompass an additional parking area of 2,844 square feet, thereby increasing the parking area on the property to a total of 5,477 square feet.

6

32.     The driveway and existing parking spaces on the property are asphalted. Applicant proposes to asphalt all additional parking spaces, if its application is approved.

33.     Applicant's property consists of 0.75± acres. With the additional parking spaces Applicant proposes, the building and other site development will cover approximately 10,552 square feet of the property, which will constitute 33% lot coverage. See Applicant's site plan (Exhibit 33).

34.     The carriage house has a row of shrubs along a portion of its exterior front wall. Applicant proposes to plant and maintain similar shrubs along the remaining portion of that front wall, to provide some screening from vehicle headlights disturbing the tenants of the carriage house.

**Conclusions of Law**

### I.     Overview

As noted in our pre-trial Entry Order,[5] this appeal presents two principal issues to the Court: whether Applicant is entitled to (1) conditional use approval to increase the number of tenants in Unit #1 on its property from four to six and (2) increase the total parking on its property from six to thirteen parking spaces.

We begin our analysis with a review of the DRB decision, since the DRB, while denying the pending application, rendered positive findings on some of the necessary criteria for the requested approval. Since no party appealed those positive findings, they have become final and may be relied upon by Applicant and this Court. 24 V.S.A. § 4472(d) (upon failure to appeal a decision all interested persons are bound by that decision); V.R.E.C.P. 5(f) (parties may not raise "any question on the appeal not presented in the statement [of questions] as filed"). We therefore focus our analysis on the criteria for which the DRB rendered adverse findings, since an applicant must receive affirmative findings under all applicable conditional use criteria in order to receive approval. CDO § 3.5.6(a); see also 24 V.S.A. § 4414(3)(A) ("the proposed conditional use shall not result in an undue adverse effect on <u>any</u>" of the applicable criteria) (emphasis added).

The DRB noted that CDO § 4.4.5(d)(5)(C) permits a property owner to rent a dwelling unit to more than four unrelated adults, provided the increase in occupancy conforms to the

---

[5] <u>In re Whiteyville Properties, LLC</u>, No. 179-12-11 Vtec, slip op. at 2 (Vt. Super. Ct. Envtl. Div. Dec. 13, 2012) (Durkin, J.).

applicable conditional use criteria of CDO Article 3 and certain minimum dimensions, specifically that the dwelling unit must have at least 2,500 square feet (not including any attic and basement) and, in the case of properties in the RL District, that "the dwelling unit [must] also contain[] at least an additional two hundred fifty (250) square feet and one (1) additional parking space per adult occupant in excess of four (4)." CDO § 4.4.5(d)(5)(C)(i). The DRB interpreted these provisions to require that for Applicant's Unit #1 to be occupied by six unrelated adults, that Unit must have a minimum of 3,000 square feet and two additional parking spaces. In RE: 26 Summit Street (Ward 6, RL)( Tax Lot No. 050-015-000), App. No. 12-0470CA/CU, slip op. at 4 (Burl. DRB Dec. 6, 2011). The DRB concluded that Applicant had satisfied these dimension provisions, since Unit #1 contains 3,470 square feet and Applicant proposed to install several additional parking spaces. Id.

The DRB concluded, however, that Applicant's proposed occupancy increase does not conform to several applicable conditional use criteria and therefore denied the pending application. Since Applicant preserved that legal issue for our review in this de novo appeal, we next address whether Applicant, through the evidence presented at trial, has provided a sufficient basis for this Court to conclude that the increased occupancy in Unit #1 conforms to the applicable conditional use criteria.

## II. Conditional Use Review

We first note that the pending application does not concern a new development, but rather an increase in occupancy to one of four dwelling units already on Applicant's property. Other than the proposed increased parking, which we discuss in the following section, Applicant's proposed occupancy increase does not require any changes to the interior or exterior of the existing buildings or a change of use. In fact, were it not for the concerns expressed by the neighbors regarding noise and other disturbances, it is unlikely that this application would have been the subject of an appeal or the resulting trial. Furthermore, had Applicant not revised its positions and the evidence it presented to the DRB, specifically its position on the need for a management plan and an on-site manager, it is likely that the Court would have also denied the pending application because of these legitimate concerns.

Article 3 of the CDO governs review and approval of proposed conditional uses. In light of the DRB's adverse findings, we focus principally on the question of whether the increased number of tenants proposed by Applicant is likely to cause an undue adverse impact

upon (a) the character of the surrounding area (CDO § 3.5.6(a)(2)) or (b) any standards or factors contained in municipal ordinances or state statutes (CDO § 3.5.6(a)(4)).

In considering whether there will be an undue adverse impact on the character of the area we must first define this character. Nearly all of the individual lots in the area surrounding Applicant's property are developed, although nearly all of that development is residential in nature and many of those residences are owner-occupied. Many of the neighborhood properties include duplexes, some or all of which are rental units. Most of the neighborhood tenants are students at the nearby colleges and universities.[6]

The impact of Champlain College and UVM on the character of the area is confirmed by activities on properties within the same block as Applicant's property. These include a Champlain College dorm, a fraternity, and a UVM educational building. Most properties in this neighborhood host fewer tenants, and some properties are only occupied by their owners. Applicant's property hosts a large number of tenants at present, but several other properties in the neighborhood have as many or more tenants. Increasing Applicant's total occupancy to 17 will not cause it to have more tenants than several neighboring properties. Thus, we conclude that Applicant's proposed expansion is not out of character with the surrounding neighborhood.

Even though we conclude that a 17-tenant rental property is not out of character with this neighborhood, we have concerns that Applicant's operation and management of this rental property may be adverse. First, we note that Applicant's property and its surrounding neighborhood are located in the RL District, which the City has designated to be "intended primarily for low-density residential development in the form of single detached dwellings and duplexes [and] . . . typically characterized by a compact and cohesive residential development pattern reflective of the respective neighborhoods' development history." CDO § 4.4.5(a)(1). The purposes of the residential zoning districts are generally defined as "intended to control development . . . in order to create a safe, livable, and pedestrian friendly environment [and] . . . intended to create an inviting streetscape for residents and visitors." Id. at § 4.4.5(a). In order for us to conclude that Applicant's proposed occupancy expansion is not adverse to the

---

[6] While our Findings only specifically mention Champlain College and UVM, the Court is aware that there are a total of five higher education institutions in and near the City.

character of this neighborhood, we must be confident that the proposed expansion respects and is aligned with the purposes and goals expressed in the CDO.

We were inclined to conclude that, if unconditioned, Applicant's proposed expansion may be adverse to the neighborhood's character, principally because of the manner in which Applicant has managed the property in the past. This neighborhood evidences a delicate balance between its residential history, past and present, and the increasing influences of the surrounding institutions. These competing types of development can co-exist, provided all occupants maintain respect for the quiet, peaceful setting that this neighborhood represents.

Tenants, especially student tenants, may sometimes be unable to recognize and respect the important character of this neighborhood, either because they have just recently moved to the area, or because their youthful nature causes them to focus more on their academic and social pursuits. Thus, the principal responsibility toward the neighborhood must fall upon the owners who rent out portions of their residences. The credible evidence at trial showed that Applicant has not been vigilant in showing respect for this neighborhood. Specifically, loud noises and profanity have disturbed a neighbor late at night. The LLC members' admission that they had not introduced themselves to their neighbors and provided them with their contact information increased our concerns. Anecdotally, the fact that the LLC members stated that they had lease provisions prohibiting barbecues within ten feet of their buildings, and yet a barbecue grill was located on the main house porch, indicates Applicant's failure to attend to the property. Furthermore, the City put in to evidence multiple photos showing debris on the front lawn and an unkempt yard that appeared to last for some time, not merely during the "move-in" or "move-out" days, as the LLC members suggested. See City Exhibits I through S. Any expansion of these types of impacts would certainly be adverse to the character of this area.

We are cautious, however, about rejecting the pending application, for several reasons. First, Applicant seeks a small increase in the current lawful occupancy. Second, while we reject Applicant's assertion that this is a "high density" residential neighborhood, we note that the CDO defines "low density" as having up to seven dwelling units per acre. CDO Table 4.4.5-2. Applicant's property contains three-quarters of an acre; we therefore surmise that the CDO allows for up to five dwelling units on a property of this size within the "low density" definition. We also note that we are directed to interpret zoning regulations narrowly, with an

eye toward an applicant's use of their property, since zoning regulations are in "derogation of common law private property rights." City of Rutland v. Keiffer, 124 Vt. 357, 360 (1964).

While we are encouraged by Applicant's recent acknowledgment that its property needs a formal management plan and an on-site manager, we share the City's regret that Applicant and its LLC members chose not to acknowledge this need sooner. Because Applicant continued to argue during trial and in post-trial filings that a plan and on-site manager are unnecessary, we remain concerned about Applicant's and its members' commitments to effectively administering the management plan. Applicant and its members also seem to have composed their draft management plan with less than stellar conviction. Indeed, the draft plan contains several typographical errors and confusing references.

Despite these shortcomings, the proposed management plan has the substantive provisions necessary to quell the disturbances that have occurred in the past, provided that Applicant and its members adhere to the management plan and maintain an effective on-site manager for the property. We therefore attach a copy of Applicant's management plan (Exhibit 36) to this Decision on which we have noted our suggested revisions. We also recommend that Applicant's members read the draft plan thoroughly when making the necessary revisions and submit a corrected management plan to this Court and to the City prior to increasing the occupancy for Unit #1 beyond four unrelated adults.

Our decision to conditionally approve the pending application is motivated by a hope that with the management plan in place and with dedication to the plan from Applicant, its members, and its tenants, Applicant may operate its rental property while respecting its neighbors and the character of the neighborhood. We therefore conclude that, subject to the conditions expressed below, Applicant's request to increase its total lawful occupancy for Unit #1 from 15 to 17 unrelated adults will not have an adverse impact upon the character of the area or the standards and factors articulated in the CDO. We therefore conclude that the proposed occupancy increase, as conditioned below, conforms to CDO §§ 3.5.6(2) and (4).

The DRB rendered additional adverse determinations when reviewing the conditional use criteria and how the proposed occupancy increase may impact on those criteria. For the same reasons expressed above, we conclude that Applicant's proposed occupancy increase, as conditioned below, (a) provides for appropriate mitigation measures; (b) complies with the expressed intent and purposes for the RL District; and (c) complies with the applicable nuisance

11

and performance standards. We therefore conclude that the proposed occupancy increase, provided Applicant abides by the conditions below, conforms to CDO §§ 3.5.6(a)(10), §4.4.5(a)(1), and §5.5.1. With these final determinations, we conclude that Applicant's requested occupancy increase, as proposed and conditioned, is entitled to conditional use approval.

### III.     Requested Parking Increase

We have previously interpreted the applicable provisions that govern parking spaces and Applicant's proposal to increase the number of spaces on its property. See In re Whiteyville Properties, LLC, No. 179-12-11 Vtec, slip op. at 3–4 (Vt. Super. Ct. Envtl. Div. Dec. 13, 2012) (Durkin, J.). Applicant's proposed parking plan has not changed from the plan presented in support of its summary judgment motion. We therefore rely upon the legal analysis in our prior Entry Order, specifically that the CDO requires at least two parking spaces for each dwelling unit on a property and limits the parking to no more than 125% of that amount. CDO Table 8.1.8-1 and CDO § 8.1.9. Thus, as currently operated, Applicant is entitled to maintain no less than eight and no more than ten parking spaces on its property.

A further increase of parking spaces is allowed when the DRB or this Court authorizes an increase in the number of unrelated adults that occupy an individual dwelling unit. CDO § 4.4.5(d)(5)(C)(i) (providing that when approval is granted to increase the number of unrelated adults occupying a dwelling unit, the development must include "one (1) additional parking space per adult occupant in excess of four"). Therefore, since we have approved Applicant's proposal to increase the maximum number of unrelated adults that occupy Unit #1 from four to six, Applicant is required to have two additional parking spaces. This addition increases the maximum number of allowable parking spaces to 12. We therefore conclude that Applicant's request to expand its parking may be approved, conditioned upon the expanded parking being limited to a maximum of 12 spaces.

Applicant asserted, both at trial and in its pre- and post-trial filings, that the DRB approved its parking expansion plan. Applicant is mistaken. In fact, the DRB specifically denied Applicant's expanded parking request, pursuant to the DRB motion made and approved in response to the pending application.[7] Applicant is correct that the DRB made certain

---

[7] In RE: 26 Summit Street (Ward 6, RL)( Tax Lot No. 050-015-000), App. No. 12-0470CA/CU slip op. at 6 (Burl. DRB Dec. 6, 2011).

affirmative findings in response to its parking expansion proposal,[8] but those affirmative findings do not constitute a legal determination to grant the parking request. In fact, Applicant appeared to acknowledge the DRB's denial of its parking plan when Applicant filed its Statement of Questions, which included a challenge to the DRB's denial of its "expansion of the parking lot." (Applicant's Statement of Questions at ¶ 1, filed Dec. 18, 2011). Because Applicant presented the question for our review, we have responded by conditionally approving its parking expansion request.

**Conclusion**

For all the reasons detailed above, we conclude that Applicant's proposal to increase the occupancy of Dwelling Unit #1 in the main house of its property at 26 Summit Street conforms to the applicable provisions of CDO Article 3 (governing conditional use review and approval) and CDO Articles 4, 5, and 8 (governing residential uses in the RL District, nuisances, and parking), conditioned upon the following:

1. Applicant shall revise its proposed Property Management Plan to include the revisions and corrections noted on the attached marked draft and shall review the draft again for accuracy and clarity of references. Applicant shall then provide finalized copies of the Property Management Plan to the Court, all existing and future tenants of 22–26 Summit Street, and the City of Burlington Office of Code Enforcement.

2. Whenever Applicant makes any revisions to its Property Management Plan, Applicant shall provide copies of the revised Plan to the City of Burlington Office of Code Enforcement and all existing and future tenants of 22–26 Summit Street.

3. Applicant shall provide all tenants with a copy of the current Property Management Plan and require all tenants to acknowledge receipt of the Plan by having the tenant sign an acknowledgment on either their lease agreement or a copy of the Plan.

4. Applicant shall abide by and require its tenants to abide by all terms and conditions of the Property Management Plan.

5. Applicant shall be responsible for identifying an on-site manager who shall be available for all tenants, neighbors, and City officials to contact concerning events or disturbances occurring at 22–26 Summit Street. Applicant shall confirm that its on-site manager has provided his or her contact information to all tenants, abutting neighbors, and City officials.

6. Applicant's use and operation of the Property Management Plan and an on-site manager are material terms of the Court's conditional approval of this application. Applicant's failure to employ a Property Management Plan or on-site Manager will therefore be a violation of the Court's order and conditional use approval.

---

[8] Id. at 5.

13

7.  Applicant shall revise its site plan (Exhibit 33) to reflect that no more than twelve parking spaces may be developed and maintained on the property.

A Judgment Order accompanies this Merits Decision.  This completes the current proceedings before this Court on this application.

Done at Berlin, Vermont this 19th day of December, 2013.


_____

Thomas S. Durkin, Environmental Judge